

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-13-1999

# In re: O'Brien Environmental Energy, Inc.

Precedential or Non-Precedential:

Docket 98-6331

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"In re: O'Brien Environmental Energy, Inc." (1999). *1999 Decisions.* Paper 256.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/256

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

In re O'BRIEN ENVIRONMENTAL ENERGY, INC., Debtor

Manus Corporation
v.
NRG Energy, Inc.; NRG Generating (U.S.) Inc.; Official Committee of Unsecured
Creditors (Newark, New Jersey Civil No. 97–cv–4312)

In re O'Brien Environmental Energy, Inc., Debtor
Manus Corporation
v.
Official Committee of Unsecured Creditors (Newark, New Jersey Civil No. 97–cv–
4992)
Manus Corporation, Appellant

No. 98–6331.

United States Court of Appeals,
Third Circuit.
Argued: May 18, 1999
Filed Sept. 13, 1999

On Appeal From the United States District Court, For the District of New Jersey Appeals. Consolidated Under District
Court Docket No. 97–cv–4312 District Judge: Honorable Maryanne Trump Barry.

Edgar M. Whiting, III, Esq. (ARGUED), GREINER & LANGER, Parsippany, NJ, Counsel for Appellant.

Douglas E. Ernst, Esq., Troutman Sanders, Esq., Atlanta, GA, Counsel for Appellees NRG Energy, Inc. and NRG
Generating US. Mitchell A. Karlan, Esq., Gibson, Dunn & Crutcher, New York, N.Y.,
Counsel for Appellee NRG Energy, Inc.

Craig J. Donaldson, Esq. (ARGUED), Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ,
Counsel for Appellee NRG Generating US.

Mark N. Parry, Esq., Moses & Singer, New York, N.Y.,
Counsel for Appellee Official Committee of Unsecured Creditors.

Before: BECKER, Chief Judge, RENDELL, and ROSENN, Circuit Judges

OPINION OF THE COURT

RENDELL, Circuit Judge.

This case requires us to apply the test for "excusable neglect" outlined in Pioneer Investment Services Co. v. Brunswick
Associates Limited Partnership, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). Appellant, Manus

Corporation, urges that the Bankruptcy Court erred in refusing to grant relief from a judgment entered in the bankruptcy proceedings of O'Brien Environmental Energy, Inc.1 under principles of excusable neglect. The District Court affirmed the Bankruptcy Court's refusal to grant relief. Because we conclude that Manus was entitled to relief because of excusable neglect on its part, we will reverse.

_____

1. O'Brien, the debtor in this case, changed its name to NRG Generating (U.S.), Inc. as of April 30, 1996, the effective date of the reorganization plan at issue in this case. NRG Energy, Inc., is a corporation which, under the successful reorganization plan, acquired 41.86% of the stock of the reorganized debtor and 100% of the stock of the debtor's subsidiaries which operated certain energy projects. For the purposes of this opinion, appellees in this case are referred to as "O'Brien" or "the debtor" prior to its reorganization, and as "NRG" or "the reorganized debtor" after the reorganization.

_____

## I. Facts

Manus Corporation and O'Brien Environmental Energy, Inc. were parties to a landfill gas purchase and sales agreement dated April 2, 1986 (the "Gas Purchase Agreement"). After disputes arose concerning the Gas Purchase Agreement, the parties entered into a permanent consent decree on August 15, 1994, which provided that O'Brien owed Manus $124,094.99. 2

Soon thereafter, on September 28, 1994, O'Brienfiled a petition for relief under Chapter 11 of the Bankruptcy Code in the District of New Jersey. On Schedule F to the schedules it filed in its Chapter 11 proceeding, O'Brien indicated that Manus was the holder of an undisputed, unsecured, non-priority claim in the amount of $124,095.00 arising out of the Gas Purchase Agreement. After several reorganization plans were considered, the debtor's Fourth Amended and Restated Plan was confirmed on February 13, 1996 ("the Plan"). It is fair to characterize the Plan as sophisticated, written more in legal and technical terminology rather than layman's parlance. The Plan contains numerous definitional sections and provisions for dealing with many specific claims. It makes numerous references to "cure" payments relating to secured claims, has a very detailed system for classifying different types of claims, and establishes separate reserves for different classes of claims. In the definitional section, the term "Administrative Claim" is defined to include, among other things, amounts required to be paid under § 365 upon assumption of executory contracts. The Plan provides in § 8.2 that all executory contracts that were not rejected were to be assumed, and that "[a]ll payments required by Bankruptcy Code section 365(b)(1)(A) or (B) shall be made by Reorganized O'Brien on the Effective Date ... in such amount as may be

determined, in each instance, by agreement between NRG and the non-debtor party to the contract or, in the case of any
dispute, by Final Order of the Court."3  The Gas Purchase Agreement between Manus and the debtor was not rejected
and, therefore, was to be assumed in the reorganization. Manus voted in favor of the Plan, and the effective date of, and
closing under the Plan, was April 30, 1996.

_____

2. Although Jack Blanton, President of Manus, asserted in his Certification that the consent decree provides that O'Brien owed Manus $125,586.32 plus interest, this figure does not appear anywhere in the consent decree. Instead, the consent decree states at ¶ 6 that O'Brien owes Manus $124,094.99.

3. Section 365(b)(1)(A) of the Bankruptcy Code provides:

     If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such
     contract or lease unless, at the time of assumption of such contract or lease, the trustee--
     (A) cures, or provides adequate assurance that the trustee will promptly cure, such default.

_____

Following confirmation of the Plan, on February 20, 1996, debtor filed an application with the Bankruptcy Court entitled:
"Application for Order Establishing (i) Administrative and Priority Claims Reserve (ii) Disputed Claims Reserve (iii) Cure
Amounts with Respect to Claims Arising Pursuant to Bankruptcy Code Sections 365(b)(1) and 1124(iv) Reserve for
Claims Subsequently Asserted with Respect to Executory Contracts or Leases to be Rejected and (v) Additional
Procedures with Respect to Final Fee Applications" (the "Application"). As the Application is central to our resolution of
this case, it is necessary to detail its contents and format.

The Application is twelve pages long and consists of twenty-four paragraphs. It does not mention Manus, nor is it
directed to any specific respondent. Rather, it is directed to "The Honorable Rosemarie Gambardella, United States
Bankruptcy Court." The first several paragraphs of the Application note that under certain sections of the Plan, NRG is
responsible for funding the payment of Administrative Claims and Priority Claims, and provides for the establishment of an
Administrative and Priority Claims reserve in an amount to be determined prior to the effective date of the Plan. It also
notes that pursuant to § 1.155 of the Plan, the Reserved Administrative and Cure Claim Cash Amount is fixed at
$14,468,000.

Paragraph 6 of the Application notes that "by this Application, the Debtor seeks a determination by the Court, and the

entry of an appropriate Order, establishing the amount of the Administrative and Priority Claims reserve." At paragraph 8, the Application states that "by this Application, the Debtor seeks the entry of an appropriate Order, determining the maximum amount of each Disputed Claim...." In Paragraph 9, the debtor speaks to the reader in the second person, stating:

If your claim has been objected to but not resolved by Final Order, is objected to prior to the Effective Date of the Plan, or is the subject of an amendment to the Debtor's schedule of liabilities ..., the amount of the Disputed Claims Reserve established for your Disputed Claim will at this time be the amount of the unsecured claim.

At paragraph 10, the Application lists certain specific creditors, and the amounts to be paid to each on the effective date to cure pre-Chapter 11 defaults and, under paragraph 11, notes that "[b]y this Application, the Debtor seeks the entry of an Order establishing that the above amounts are the amounts required to be paid ... on the Effective Date to cure existing defaults and reinstate the maturity of these Secured Claims." Similarly, at paragraph 12, the Application lists certain specific creditors and claim amounts, and at paragraph 13, indicates that by the Application, it seeks the entry of an order that the amounts stated are the amounts necessary to cure existing defaults and reinstate these guarantees as obligations of the reorganized debtor, and declaring that the payment of these amounts will satisfy the cure requirements of § 1124.

Paragraph 14 references § 8.2 of the Plan, and states that all executory contracts and unexpired leases to which the debtor is a party that have not been rejected shall be assumed on the effective date. Paragraph 14 also states that all payments required by the Bankruptcy Code under § 365(b)(1)(A) or (B) are to be made by the reorganized debtor on that date. The Application does not reference the name of any party to these executory contracts, except that in paragraph 15, it states that "the only amount[the debtor] is required to pay pursuant to Section 365(b)(1)(A) or (B) to cure existing defaults or to compensate lessors for actual pecuniary loss resulting from default is the payment of $123,000 to MDFC Equipment Leasing Corp."

We quote the next paragraph, paragraph 16, verbatim:

By this Application, the Debtor seeks an Order establishing that the payment of $123,000 to MDFC Equipment Leasing Corporation is the only payment required to assume the Assumed Contracts and declaring that payment of this amount to MDFC Leasing Corporation will satisfy the requirements of Section 365(b)(1)(A) and (B) with respect to all of the Assumed Contracts. Any party to an Assumed Contract that fails in connection with this Application to assert a claim

which arises under such Assumed Contract or with respect to which such party could otherwise require payment under Bankruptcy Code Section 365 in connection with the assumption of such Assumed Contract (an "Assumed Contract Claim") shall be deemed to have waived such Assumed Contract Claim and shall be precluded from later asserting such Assumed Contract Claim. The Debtor has served copies of the Application and the Notice of Motion filed herewith on all known parties to Assumed Contracts.

When filing the Application, O'Brien also sought entry of an order shortening the time period for notice with respect to the Application and setting a hearing. The Bankruptcy Court entered an order on February 22 shortening the time for notice and setting a hearing on the Application for March 8.

Mr. Blanton, President of Manus, testified that he received the Application, leafed through it to see if there was any mention of the Manus claim or claim amount and, seeing none, figured that the Application did not affect his rights or interests. He continued to assume that, pursuant to the terms of the Plan, his claim amount would either be agreed upon or would be litigated if agreement could not be reached. As a result of Blanton's review of the Application, he did not send it to his attorney, nor did anyone from Manus attend the hearing on March 8. Mr. Blanton later testified regarding his understanding of the Application:

I looked at it and noted that it was addressed to 200 or so addresses and then went through, page by page, looking for the name Manus or $125,000. And I saw numerous references to other companies and dollars in there but no reference, whatsoever, to Manus or to the guarantee [Agreement]. And I concluded that it was a routine paperwork process, if you will for lack of a better term, of the bankruptcy proceedings. When the Judge ruled on January, I think 17th, I breathed a sigh of relief and thought the show is over I will get paid. And I dropped my defenses rather. I thought O'Brien was a large financially sound reasonable company, some kind of corporate guidelines of my years of experience for working with corporations. Did not work out that way.

Following the hearing on the Application, the Bankruptcy Court entered an order, dated March 8, 1996, which includes a declaration that: "With respect to all other Assumed Contracts, other than those listed on Exhibit 'G', no amounts are required to be paid pursuant to 11 U.S.C. Section 365(b)(1)(A) and (B) in order for Reorganized O'Brien to assume said Assumed Contracts." Exhibit G listed only MDFC Equipment Leasing Corporation, Southern California Edison, and County of Montgomery. The order provided for service on "all known parties to executory contracts assumed by the Debtor pursuant to the NRG Plan," but there is no evidence in the record that this order was served upon Manus, and

Blanton attested that it was not.

Thereafter, in early April 1996, Manus received a document entitled "Second Omnibus Objection of Official Committee of Unsecured Creditors to Disallow Certain Claims Scheduled by or Filed Against Debtor" (the "objection"). By way of this document, the Creditors Committee sought to expunge Manus's claim as listed in O'Brien's schedules. The objection alerted Manus to the entry of the March 8 order deeming its claim waived. Manus forwarded the objection to its counsel, Edgar Whiting, III, who immediately reviewed the bankruptcy court docket and files "to determine what other pleadings and orders had been filed relevant to the motion resulting in the March 8 Order." Whiting contacted NRG's counsel by telephone on April 23, 1996 "to explain Manus's position and to attempt to resolve the matter consensually." Following this conversation, Whiting faxed a letter to NRG's counsel, as well as its in-house counsel, explaining Manus's position with regard to its claim and its understanding of the Application. Whiting and the Creditor's Committee agreed to adjourn the deadline for response to the objection so that Manus had sufficient time to respond. On May 17, 1996, Manus filed its opposition to the Creditor's Committee objection and a cross-motion for relief from the March 8 order under Federal Rule of Civil Procedure 60(b), claiming that its failure to respond to the Application was the result of excusable neglect. In the meantime, the Plan took effect on April 30, 1996.

Following a hearing, the Bankruptcy Court ruled that Manus's failure to respond to the Application was not excusable and thus, denied Manus's cross- motion. It stated, first, that the court was "satisfied that prejudice to the Reorganized Debtor requires denial of Manus' cross motion." In so finding, the court noted that it was undisputed that:

[N]one of the cash available from the effective date funding of the NRG Plan, was allocated to pay the cure claim of Manus and there appears to be no mechanism for paying any cure claim, except by imposing a new obligation on the Reorganized Debtor. This fact constitutes in this court's view prejudice to the Reorganized Debtor.

The court next considered that "the impact of delay on judicial proceedings is significant." Citing Trump Taj Mahal Associates v. Alibraham (In re Trump Taj Mahal Associates), 156 B.R. 928 (Bankr.D.N.J.1993), it stated that allowing relief from the March 8 order after the effective date of the Plan "would undermine the stability of the confirmation process."

Referencing paragraphs 14, 15, and 16 of the Application, which stated that failure to respond would constitute waiver of any potential claims, the court then noted that Manus's "excuse" for not responding to the Application was its failure to

comprehend the significance of the Application; therefore, the delay in this case was caused by reasons within its reasonable control. The court believed that any deficiencies with regard to notice to Manus were different from those deficiencies noted in the landmark Supreme Court case regarding excusable neglect, Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), and also that, although Manus acted in good faith, it must consider the fact that the Court in Pioneer stated that the outcome would have been different if it had found prejudice. The Bankruptcy Court concluded:

In the instant case, allowing relief from the March 8 order would clearly prejudice the Reorganized Debtor. The length of delay is significant and would impact adversely on the judicial proceeding, and as previously found, it was Manus--in fact, it was the actions of Manus itself that caused the delay. Given these findings, combined with the Court's finding that Manus received adequate notice of the cure claim application, that the application was not ambiguous[,] this Court finds that Manus has failed to establish excusable neglect.

The Bankruptcy Court also ruled that the mechanism of filing a motion to establish cure claims was consistent with Bankruptcy Rules 6006 and 9014.

On appeal, the District Court affirmed the ruling of the Bankruptcy Court, finding that examination of the factors outlined in Pioneer supported the decision below. It agreed that requiring NRG to pay Manus's untimely claim would prejudice NRG "because no funds were set aside for the payment of Manus's claim." Such payment, it believed, would deprive NRG "of the fresh start to which it is entitled." The District Court acknowledged that the length of the delay in this case was not great in an absolute sense, but considered significant the timing of the delay, namely, that the Rule 60(b) motion was filed after the Plan took effect. Finally, the court found most convincing the fact that the cause of the delay was in Manus's control. It stated that "the language of the [A]pplication and the deadline included therein were not so 'dramatically' ambiguous as to justify Manus's failure to respond." The District Court also affirmed the Bankruptcy Court's decision that determinations of cure claim payments could properly be sought by way of motion.

On appeal, Manus attacks the court's refusal to grant relief as an abuse of discretion and argues that this case falls squarely under Pioneer, in that it is a case of excusable neglect, where, lacking prejudice, its requested relief should have been granted. Manus also contends that the debtor should have proceeded to litigate Manus's claim by way of an adversary proceeding, rather than by motion.

## II. Discussion

Because the District Court in this case sat as an appellate court reviewing a final order of the Bankruptcy Court, our review of its determination is plenary. Interface Group–Nevada, Inc. v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 145 F.3d 124, 130 (3d Cir.1998). In reviewing the decision of the Bankruptcy Court, we exercise the same standard of review as the District Court, that is, we review the Bankruptcy Court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof. Id. A bankruptcy court abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts. Marco v. Accent Pub. Co., 969 F.2d 1547, 1548 (3d Cir.1992). In determining whether an error exists, we review de novo the District Court's application of the law to the facts. Id. The Bankruptcy Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1334. The District Court had appellate jurisdiction over the final order of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a). We have jurisdiction pursuant to 28 U.S.C. §§ 158(d) & 1291. We will first address the issue of whether determinations of cure claim payments are properly sought by the filing of a motion, and will then address the issue of excusable neglect.

## A. Form of Proceedings

Manus argues that the debtor should have sought the relief requested in the Application by way of an adversary proceeding, commenced by a complaint, pursuant to Bankruptcy Rule 7001.4 Appellees counter, and the Bankruptcy Court and the District Court agreed, that proceeding by way of motion, as opposed to a separate adversary proceeding, was in accordance with the Bankruptcy Rules. We agree with the reasoning of the Bankruptcy Court and District Court on this issue and will affirm this aspect of the District Court's order.

---

4. Bankruptcy Rule 7001 states, in pertinent part, the following:

An adversary proceeding ... is a proceeding ... (2) to determine the validity, priority, or extent of a lien or other interest in property, other than a proceeding under Rule 4003(d), ... (7) to obtain an injunction or other equitable relief, ... [or] (9) to obtain a declaratory judgment relating to any of the foregoing.

---

The parties agree that the Federal Rules of Bankruptcy Procedure do not explicitly prescribe a procedure for establishing cure claim amounts payable upon the assumption of executory contracts. They also agree that case law concerning this issue is lacking. Appellant argues that the Application sought both declaratory and injunctive relief concerning the debtor's

relationship with Manus and thus requires an adversary proceeding under Rule 7001(7) and (9). Appellant also argues that the purpose and effect of the Application was to determine the extent of Manus's interest in the Gas Purchase Agreement and thus falls under Rule 7001(2).

We do not agree with Manus that the relief sought in the Application falls under the auspices of Rule 7001. We do not read the Application as seeking "to determine the validity, priority, or extent of a lien or other interest in property," since the contract had already been assumed and thus, there was no property at issue. Further, we do not view the relief as equitable in nature, since the basic relief sought by the Application was not classic equitable relief, such as specific performance, but was the establishment of reserves and cure amounts. See In re Robertson, 206 B.R. 826, 829 (Bankr.E.D.Va.1996) (determining that request for dismissal of bankruptcy proceedings was properly made by motion, and was not equitable relief, by looking at the essence of the basic relief sought). While many court orders in bankruptcy proceedings could arguably be considered as providing equitable relief, we do not believe that this means that every filing seeks "equitable relief" as referenced in Rule 7001(7), as appellant suggests. See In re Vance, 120 B.R. 181, 191–92 (Bankr.N.D.Ok.1990) (stating that the distinction between an order and an injunction is often unclear and a matter of degree; holding that debtor's request to compel the trustee to conclude the creditor's meeting was not equitable relief). The reading of Rule 7001(7) appellant urges would render meaningless other rules that require certain requests to the court to be made by motion and application, contrary to general principles of statutory interpretation. The Court of Appeals for the Tenth Circuit came to a similar conclusion in State Bank v. Gledhill (In re Gledhill), 76 F.3d 1070, 1078 (10th Cir.1996), where it applied principles of statutory construction to reject a broad interpretation of Rule 7001(7),finding that such an interpretation would negate the specific provision for making certain requests by motion in Rule 60(b). The court in In re Gledhill held, therefore, that a request to vacate relief from an automatic stay, even though such a request invoked equity powers to revive a stay, was properly made by motion. Id.

We find appellees' argument that this situation is governed by Rules 6006 and 9014 to be a more logical and practical application of the Bankruptcy Rules. Rule 6006(a) states that "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease, other than as part of a plan, is governed by Rule 9014." Bankruptcy Rule 9014 states, in pertinent part, the following:

In a contested matter in a case under the Code not otherwise governed by these rules, relief shall be requested by motion,

and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought.

Technically, the setting of cure claim amounts is "not otherwise governed by" the Bankruptcy Rules, and thus falls under the auspices of Rule 9014. Further, as stated by the District Court, "determining the amount necessary to cure existing defaults is necessarily related to the assumption or rejection of executory contracts." We conclude that, viewing Rules 6006 and 9014 together, the Rules anticipate that this type of issue would be resolved by motion practice. We view Rules 6006 and 9014 as suited to the instant situation and as providing a betterfit than the procedural characterization urged by appellant.

Aside from the Rules discussed herein, Manus has not referred us to any authority stating that the setting of cure claim amounts may not proceed by motion and must proceed by way of complaint as an adversary proceeding. Manus has not convinced us that a party must commence an adversary proceeding to set cure claim amounts. We hold, therefore, that proceeding by motion in these circumstances was proper.[5]

_____

5. Although the parties did not raise this point, we note that O'Brien actually sought to set the cure claim amounts by neither adversary proceeding nor a motion as such, but by application. There is no definition of "application" in the current Bankruptcy Rules despite its repeated use in the Rules. Prior to the 1983 amendments, however, the Bankruptcy Rules contained a definition of "application," which included "any request to the court for relief that is not a pleading or a proof of claim." Bankr.R. 901(4). The Advisory Committee explained that an application was appropriate "[w]hen the bankrupt or trustee or other party seeks an order involving no adverse party." Advisory Committee Note to former Bankr.R. 901(4). The current Bankruptcy Rules do not appear to have disturbed this meaning and usage. The Rules generally require a motion when notice to an opposing party is necessary, and only allow an application if no such notice is required. See 6 Norton Bankr.Law & Practice 2d § 138:14 (West 1999). For example, the current rules allow a party to file an application for permission to pay a filing fee in installments, Bankruptcy Rule 1006, for an order of employment, Bankruptcy Rule 2014, and for a party seeking compensation or reimbursement for services rendered, Bankruptcy Rule 2016

_____

B. Excusable Neglect

As a result of the Bankruptcy Court's March 8 order, Manus was deemed to have waived its claim in connection with the Gas Purchase Agreement and was "barred from asserting it hereafter." It is undisputed that Manus failed to assert its claim prior to the deadline set in the Application, or prior to April 30, 1996, the effective date of the Plan. Manus sought relief

from the March 8 order under Federal Rule of Civil Procedure 60(b), made applicable to bankruptcy cases by
Bankruptcy Rule 9024.6  Rule 60(b) states, in pertinent part, "[o]n motion and upon such terms as are just, the court may
relieve a party or a party's legal representative from a final judgment, order, or proceeding for mistake, inadvertence,
surprise, or excusable neglect."

_____

6. Rule 9024 provides:

    Rule 60 F.R.Civ.P. applies in cases under the Code except that (1) a motion to reopen a case under the Code or for the
    reconsideration of an order allowing or disallowing a claim against the estate entered without a contest is not subject to
    the one year limitation prescribed in Rule 60(b), (2) a complaint to revoke a discharge in a chapter 7 liquidation case may be
    filed only within the time allowed by § 727(e) of the Code, and (3) a complaint to revoke an order confirming a plan may be
    filed only within the time allowed by § 1144, § 1230, or § 1330.


_____


.


Manus asserts that its failure to respond to the Application was the result of excusable neglect. Thus, we are to determine
whether the Bankruptcy Court abused its discretion in failing to find excusable neglect. Our discussion of the issue of
"excusable neglect" must start with a review of Pioneer Investment Services Co. v. Brunswick Associates Ltd.
Partnership.

In Pioneer, the Supreme Court determined that a Chapter 11 creditor was entitled to file its proof of claim after the
deadline set by the bar date because its failure to file timely was the result of "excusable neglect" within the meaning of Rule
9006. 507 U.S. at 398–99. In so holding, the Court explicitly rejected the argument that excusable neglect applies only to
those situations where the failure to comply is a result of circumstances beyond the creditor's reasonable control. Id. at
388. It acknowledged that the mere use of the word "neglect" encompassed "omissions caused by carelessness," but took
comfort in the fact that parties would still be deterred from ignoring court ordered deadlines since the neglect must be
"excusable." Id. at 395. It stated that determining whether neglect is excusable is an "equitable" determination that "tak[es]
account of all relevant circumstances surrounding the party's omission." Id. Such an equitable determination, it reasoned,
is consistent with the policies underlying Chapter 11, as "Chapter 11 provides for reorganization with the aim of
rehabilitating the debtor and avoiding forfeitures by creditors." Id. at 389. "In overseeing this ... process, the bankruptcy
courts are necessarily entrusted with broad equitable powers to balance the interests of the affected parties, guided by the

overriding goal of ensuring the success of the reorganization." Id. To make the excusable neglect determination, the Court listed four factors for courts to consider: "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." Id. at 395.

Under the facts of Pioneer, the Court noted that the failure to file on time was inadvertent and in good faith, as counsel was not aware of the bar date. It found that there was no danger of prejudice to the debtor or the administration of judicial proceedings, as the claim, though untimely, was accounted for in the reorganization plan and was filed prior to the plan's effective date. Finally, the Court found relevant that notice of the bar date "was outside the ordinary course" in that it was not, as it should be, "prominently announced and accompanied by an explanation of its significance." Id. at 398. Instead, the "inconspicuous placement" of the deadline--a single sentence in a boilerplate document, that, according to its title, related to a creditor's meeting--"left a 'dramatic ambiguity' in the notification." Id. For these reasons, the Court found that there was excusable neglect and allowed the late filing.

Although the Bankruptcy Court engaged in the Pioneer analysis to guide its excusable neglect determination,7 we believe it erred in its analysis of prejudice, the reason for the delay, and the extent of the delay.8  We will analyze each of these factors in turn, and start with the issue of prejudice, which seemed paramount in the decision of the Bankruptcy Court and the District Court.

_____

7. The phrase "excusable neglect" appears not only in Rule 9006(b) but in Federal Rules of Civil Procedure 6(b), 13(f), and 60(b), Federal Rule of Criminal Procedure 45(b), and Federal Rule of Appellate Procedure 4(a). The Supreme Court referred to each of these rules in construing the "excusable neglect" analysis in Pioneer. Pioneer, therefore, is commonly understood to provide guidance not just with regard to Rule 9006, but in other bankruptcy and non-bankruptcy contexts discussing the issue of excusable neglect. See, e.g., Midwest Employers Casualty Co. v. Williams, 161 F.3d 877, 880 n. 6 (5th Cir.1998); Advanced Estimating Sys., Inc. v. Riney, 130 F.3d 996, 998 (11th Cir.1997); Canfield v. Van Atta Buick, 127 F.3d 248, 250 (2d Cir.1997) (per curiam); Pratt v. Philbrook, 109 F.3d 18, 19 (1st Cir.1997); Robb v. Norfolk & Western Ry. Co., 122 F.3d 354, 359 (7th Cir.1997); Committee for Idaho's High Desert, Inc. v. Yost, 92 F.3d 814, 825 n. 4 (9th Cir.1996); Thompson v. E.I. DuPont de Nemours & Co., 76 F.3d 530, 533 (4th Cir.1996). Thus, the Pioneer analysis applies in the context of a Rule 60(b) motion, as in this case.

8. There is no dispute that Manus acted in good faith. The Bankruptcy Court held that it did, and appellees do not argue to the contrary.
_____

1. Prejudice

The Bankruptcy Court held that prejudice to the reorganized debtor requires denial of Manus's motion for relief since "none of the cash available from the effective date funding of the NRG plan, was allocated to pay the cure claim of Manus and there appears to be no mechanism for paying any cure claim, except by imposing a new obligation on the Reorganized Debtor." The Bankruptcy Court's prejudice analysis seemed to hinge solely on the fact that by virtue of Manus's failure to respond to the Application, its claim was not accounted for in the funding of the Plan. We believe that Pioneer requires a more detailed analysis of prejudice which would account for more than whether the Plan set aside money to pay the claim at issue. Otherwise, "virtually all late filings would be condemned by this factor." Manousoff v. Macy's Northeast, Inc. (In re R.H. Macy & Co.), 166 B.R. 799, 802 (Bankr.S.D.N.Y.1994) (holding that the depletion of resources otherwise available for timely filed claims is not prejudice).

Though Pioneer lists prejudice as a factor in the excusable neglect analysis, it gives us little guidance as to what prejudice actually is in this context, and we have not had occasion to explore this issue. The Court of Appeals for the Fifth Circuit and several bankruptcy courts, however, have considered the Pioneer analysis and have grappled with what constitutes prejudice in the bankruptcy context. In Greyhound Lines, Inc. v. Rogers (In re Eagle Bus Mfg., Inc.), 62 F.3d 730 (5th Cir.1995), creditors sought leave to file untimely proofs of claims. Although these claims were allegedly not accounted for in the confirmed plan, the court held that there was no prejudice since the "plan was negotiated and approved after [the debtor] had notice of these claims." Id. at 737. The court found the fact that the debtor believed that the claims would be barred as untimely insufficient to constitute prejudice. In In re Keene Corp., 188 B.R. 903, 912–13 (Bankr.S.D.N.Y.1995), the court acknowledged that the determination of prejudice involved "a certain amount of crystal ball gazing," and then listed several factors to consider in a Pioneer prejudice analysis, including: the size of the claim with respect to the rest of the estate; whether allowing the late claim would have an adverse impact on the judicial administration of the case; whether the plan was filed or confirmed with knowledge of the existence of the claim; the disruptive effect that the late filing would have on the plan or upon the economic model upon which the plan was based; and whether allowing the claim would open the floodgates to other similar claims. In In re Papp International, Inc., 189 B.R. 939, 945 (Bankr.D.Neb.1995), the court relied on a Webster's dictionary definition of prejudice: a claim is prejudicial if it will "injure or damage the debtor." The court considered damage to other creditors in the form of a

reduced recovery as a consideration in determining prejudice. The court determined in that case, however, that there was no prejudice in allowing the late claim, stating:

If the IRS's proof of claim had been timely filed, the bankruptcy estate would have had to either object to the claim or provide for the claim in the plan of reorganization. If the claim is permitted to befiled late, the debtor and other interested parties are in the same position as if the proof of claim had been filed on time.
Id.

We find In re Pettibone Corp., 162 B.R. 791 (Bankr.N.D.Ill.1994), to be especially informative, since, in that case, the prejudice determination assessed prejudice to the reorganized debtor after confirmation of the plan. In that case, the reorganized debtor argued that it would be prejudiced by allowing a late claim, since allowing such claims would cause it to face increased insurance premiums and expend significant employee time. The court rejected this argument, stating:

Pettibone is now a feisty, stable, publicly-held manufacturer and active participant in the competitive commercial world. The evidence did not show that rising insurance premiums would force Pettibone back into bankruptcy, materially affect its solvency, or adversely impact at all on consummation of its confirmed Plan (which appears to be fully consummated except for the continuing claims litigation). Indeed, it was not even shown that a future increase in premiums would comprise a significant increase in Pettibone's cost of doing business. Moreover, the evidence did not establish that any premium increase would materially differ from the usual impact that other injury claims will have on its premiums for liability insurance under normal business conditions. Nor did Pettibone establish that the impact on employee time for helping defend the ... claims would differ from the burden on any company of its size to aid in defense of insured claims.
Id. at 805. The court was not concerned with the reorganized debtor being saddled with costs from the bankruptcy since the "fresh start" concept does not apply to corporate debtors. Id. at 804. The court concluded that Pettibone had suffered no "material prejudice," such as loss of the ability to defend against the late claims. Id. at 805.

Determinations regarding prejudice in other contexts also shed light on the prejudice analysis. In Feliciano v. Reliant Tooling Co., 691 F.2d 653, 656– 57 (3d Cir.1982), in a Rule 60(b) non-bankruptcy context, we stated that the cost of enforcing a judgment later vacated and the delay in realizing satisfaction on a claim "rarely serves to establish the degree of prejudice sufficient to prevent the opening of a default judgment." Instead, one must assert "loss of available evidence, increased potential for fraud or collusion, or substantial reliance upon the judgment." Id. at 657. Other circuits too have

held that prejudice is not merely the loss of an advantageous position, but must be something more closely tied to the merits of the issue. In Pratt v. Philbrook, 109 F.3d 18 (1st Cir.1997), three weeks after a settlement order of dismissal became final, plaintiff sought to have the dismissal vacated and the case reopened. With regard to the issue of prejudice, the court stated:

From our vantage point it is difficult to see what cognizable prejudice, in the sense, for example, of lost evidence, would come to the defendant from reopening the case. Of course, it is always prejudicial for a party to have a case reopened after it has been closed advantageously by an opponent's default. But we do not think that is the sense in which the term "prejudice" is used in Pioneer.
Id. at 22.

We note that, in the case before us, the opinions of the Bankruptcy Court and the District Court contain no discussion of a factual basis to support the finding of prejudice. As the cases we reference demonstrate, prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence. In assessing whether there was prejudice in this case, certain facts of record are indeed relevant: the debtor listed Manus's claim as an undisputed, unsecured claim in the amount of $124,095.00 in its schedules; O'Brien's contract with Manus was to be assumed, and the Plan stated with regard to such contracts that all payments required by § 365(b)(1)(A) or (B) were to be made on the effective date; NRG's counsel was contacted prior to the effective date of the Plan and advised of the nature of Manus's claim and Manus's intent to pursue such claim. Thus, there is no question that O'Brien and NRG were aware of Manus's claim, and its amount, and that O'Brien had not contested its existence. This is not a case where the debtor was surprised or caught unaware by the assertion of a claim that it had not anticipated. See Greyhound Lines, Inc., 62 F.3d at 738 (stating that whether debtor had a reason to expect the claim was relevant to the prejudice inquiry). To the contrary, since the Plan obligated NRG to pay all past-due amounts under the Gas Purchase Agreement, we can fairly assume that it actually planned to pay this claim.

Also relevant are the fact that the debtor's operations--admittedly healthy at the time of confirmation--were to continue under the auspices of NRG, and the Plan's establishment of reserves was merely a designation of sources of funds rather than finite "pots" for payments to other creditors. Appellees have acknowledged, both in oral argument and in a letter submission to the court, that payment of Manus's claim would not force the return of the amounts already paid out under the confirmed Plan, or affect the distribution to creditors and equity holders. The reorganized debtor is a large, successful

company with annual revenues and earnings in the millions and the payment of this claim would not jeopardize the success of the reorganization. Cf. In re Pennsylvania Truck Lines, Inc., 189 B.R. 331, 336 (Bankr.E.D.Pa.1995) (finding prejudice where payment of the late claim could jeopardize the reorganized debtor's survival). There has been no allegation, let alone evidence in the record, that payment of the cure claim of Manus by NRG would pose any problem, actually or legally, or would adversely impact any of appellees. Finally, to the extent NRG argues that allowance of this claim would open the floodgates to other future claims against them, NRG has not alleged that any other creditor promptly sought to be excused from the March 8 order so as to now be entitled to relief on the basis of excusable neglect.

Considering all of these facts, we cannot see how any of the appellees before us would be prejudiced, in the legal sense, by NRG's having to pay Manus's claim––a claim which the debtor had already planned to pay by the terms of its own Plan.9  It seems instead that the only prejudice that would result from allowing the reorganized debtor to assume the contract with Manus without curing this claim as required by the Bankruptcy Court would be the reorganized debtor's loss of a windfall. Thus, wefind no real prejudice in this fact pattern.

_____

9. We note, however, that our ruling is limited to the issue before us regarding the court's refusal to grant relief from the order of deemed waiver of Manus's claim. We do not rule as to the nature or amount of Manus's cure claim.

_____

2. Reason for Delay

The Bankruptcy Court was also influenced because the cause for delay was within Manus's control, since it admittedly received the Application advising of the hearing and Manus's need to assert its claim, but chose not to read it carefully or to ask counsel for guidance. While it is certainly relevant that the delay in this case was due in part to this lack of care on the part of Manus, the concept of excusable neglect clearly anticipates this, i.e., neglect on the part of the one seeking to be excused. See Pioneer, 507 U.S. at 388. Thus, this is not determinative to the inquiry. The Bankruptcy Court should not have limited its focus to Manus's conduct. An examination of O'Brien's role in the mishap is also essential to a determination of whether Manus's neglect was excusable. See Chemetron Corp. v. Jones, 72 F.3d 341, 350 (3d Cir.1995) (stating that the district court erred in failing to consider the debtor's role in the creditor's delay); Atlantic Richfield Co. v. Sharon Steel Corp. (In re Sharon Steel Corp.), 110 B.R. 205, 206 (Bankr.W.D.Pa.1990) (stating that the debtor was just as much at fault as the creditor for failing to consider its claim and thus was equally at fault for the

delay). As in Pioneer, the delay in this case resulted from a creditor's lack of notice of a deadline. Having reviewed the
record, including the Application and the circumstances surrounding its service upon Manus, we conclude that O'Brien's
modus operandi does not leave it blameless regarding Manus's failure to appreciate the significance of the Application.
Before it sent out the Application, O'Brien knew that Manus's claim would be impacted by it, and yet, in choosing the
format of the Application and in noticing the March 8 hearing, never addressed a notice to it or referenced its claim. The
Application was addressed to the Bankruptcy Judge and sought a court order establishing reserves and cure amounts.10

_____

10. We note that, as discussed in footnote 5, an application is to be used when there is no party to whom the pleading is directed. While
Manus does not rely on this as an excuse for its inadvertence, it would have been entirely understandable if the debtor's proceeding by
way of application had caused it to assume that the Application would not include an objection to its claim.

_____

While it was not improper for the Bankruptcy Court to distinguish this case from Pioneer, since, as opposed to the one
inconspicuous sentence announcing the bar date in Pioneer, the Application addressed executory contracts in three
paragraphs, the Bankruptcy Court should have also considered that these three paragraphs were paragraphs fourteen,
fifteen, and sixteen, that they were buried in the middle of a twelve page document, and that neither the document nor any
attachment listed the relevant contracting parties' names or claims. The title of the Application did not call attention to the
fact that it contained information critical to Manus's interests. Thus, although three paragraphs of the Application
addressed the assumed executory contracts, we conclude that NRG did not provide sufficient notice to Manus that the
Application was either an objection to Manus's claim or was seeking to determine Manus's claim once and for all. One
would not normally assume that an "application" directed to the court seeking to "establish reserves" would be the vehicle
by which the debtor would be seeking, as it said it would in the Plan, to have the court resolve a dispute relating to a
claim.

Thus, although Blanton was careless in not reading the Application carefully, and, specifically, paragraphs fourteen
through sixteen, his neglect is excusable since it was caused at least in part by O'Brien's own failure to properly alert
Manus that this "application" was really an objection to its claim. At the very least, the Application should have listed
those who obviously had executory contract cure claims that would be affected, as it did in other paragraphs naming
creditors and amounts. Instead, with respect to executory contracts, it listed only the one contract for which the debtor

was willing to concede the cure claim. We find that Manus's failure to realize the impact of the Application on its claims was the result, at least in part, of O'Brien's failure to properly alert and notify Manus that O'Brien was objecting to Manus's claim, and that Manus's claim would be waived if it did not act.

3. Length of Delay

Finally, we consider the length of the delay and its impact on the judicial proceedings. The Bankruptcy Court declared the delay and its impact "significant," because the requested relief in this case occurred after the effective date of the Plan and thus "would undermine the stability of the confirmation process." The Bankruptcy Court, however, did not really address the length of the delay. The actual delay was approximately two months, and takes on significance mainly because of the intervening occurrence of the effective date of the Plan on April 30, 1996. As the District Court noted, the delay associated with Manus's requesting relief from the March 8 order--which occurred approximately ten weeks after the March 8 hearing, approximately four weeks after Manus was aware that its claim was waived, and approximately two weeks after the effective date of the Plan--is not significant in an absolute sense. Further, it would have been only seven weeks' delay if O'Brien or NRG had reacted to the problem immediately when notified by Manus's attorney on April 23, before the Plan became effective. In addition, the detrimental impact of this delay is as much due to O'Brien's strategic decision to not object to or litigate Manus's claim until the fairly tight time frame between confirmation and the effective date of the Plan. Here, the delay factor in the excusable neglect inquiry should not be held to turn entirely on the urgency created by the debtor's time line. Such an approach makes the two month delay seem significant, whereas a similar delay, or even a much longer delay in a case where the debtor proceeds more expeditiously to resolve outstanding claims under its contracts, or allows itself more time between confirmation and closing under its plan, would be insignificant. See Chemetron Corp., 72 F.3d at 350 (remanding to determine excusable neglect where motion to file late claim occurred two years after plan was confirmed); Greyhound Lines, Inc., 62 F.3d at 740 (finding excusable neglect where delay was six to eight months). Thus, although it is proper to consider the delay's effect on the judicial proceedings, Pioneer teaches that we should consider the length of the delay in absolute terms, which the Bankruptcy Court did not do in this case.

We conclude that, considering the legal parameters of the applicable tests--namely, prejudice, the reason for the delay, and the extent of the delay--as well as the facts of this case and the equitable nature of the determination as outlined in Pioneer, the Bankruptcy Court erred in determining that Manus was not entitled to relief from the March 8 order based upon excusable neglect.

We will affirm the District Court's ruling that the debtor's request for the establishment of a cure amount could properly proceed by way of motion practice, but will reverse the District Court's ruling denying Manus relief from the March 8 order. We will remand this case to the Bankruptcy Court for proceedings consistent with this opinion.