SACK, Circuit Judge.
 

 This appeal, spawned by what would appear to be one of the largest and most complex bankruptcy proceedings in American history, presents the question whether the United States Bankruptcy Court for the Southern District of New York (Arthur J. Gonzalez,
 
 Judge)
 
 abused its discretion by denying a creditor’s motion either to amend its timely filed proof of claim against a debtor to include the debtor’s parent corporation, or to file a new proof of claim against the parent corporation, six months after the expiration of the court-imposed “bar date” for filing claims. In rejecting the motion, the bankruptcy court — applying the test for “excusable neglect” set forth by the United States Supreme Court in
 
 Pioneer Investment Services Co. v. Brunswick Associates L.P.,
 
 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) — cited the substantial length of the delay, the lack of a “genuine reason” for the late filing, and the potential prejudice to the reorganization proceedings from the possible opening of the “floodgates” to similar late claims. The United States District Court for the Southern District of New York (Alvin K. Hellerstein, Judge) affirmed the order, concluding that “the purpose of a bar date has to be given great deference.” Hearing Tr. at 16,
 
 In re Enron Corp. Corp.,
 
 No. 03 Civ. 9319 (S.D.N.Y. May 19, 2004) (“May 19, 2004, Hearing Tr.”).
 

 We affirm because we agree with the district court that the bankruptcy court did not abuse its considerable discretion in finding that the creditor’s neglect in this case was not excusable, especially in light of the complexity of the reorganization the court was overseeing.
 

 BACKGROUND
 

 This dispute arises out of a contract for the purchase natural gas by the appellant, Midland Cogeneration Venture Limited Partnership (“Midland”), from Union Pacific Fuels, Inc. (“Union Pacific”). The contract, executed on May 26, 1993, called for Union Pacific to supply natural gas to Midland from October 1, 1993, through September 30, 2006.
 
 See In re Enron Corp.,
 
 298 B.R. 513, 517 (Bankr.S.D.N.Y.2003). On May 7, 1996, Enron Capital
 
 &
 
 
 *119
 
 Trade Resources Corp., a subsidiary of Enron Corp. (“Enron”), assumed all of Union Pacific’s “rights and liabilities” under the contract, effective the following month.
 
 Id.
 
 As part of that transaction, Enron executed a guaranty of the obligations that Enron Capital
 
 &
 
 Trade — later renamed Enron North America Corp. (“ENA”)— had assumed, pursuant to which Enron “absolutely and unconditionally guarantee^] the prompt payment when due of all indebtedness and liabilities incurred” by its subsidiary.
 
 See
 
 Mot. of Midland Co-generation Venture L.P. to File Am. Proof of Claim, Ex. B.3,
 
 In re Enron Corp.,
 
 298 B.R. 513 (No. 01-16034) (“Midland Mot. to Amend”).
 

 On December 2, 2001, Enron and certain of its subsidiaries, including ENA, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Southern District of New York.
 
 In re Enron Corp.,
 
 298 B.R. at 516. Thereafter, in March 2002, ENA notified Midland that it did not intend to deliver natural gas to Midland the following month.
 
 See id.
 
 at 517. On April 19, 2002, ENA formally gave notice — under the procedure established by the bankruptcy court for terminating executory contracts — that it was rejecting its remaining contractual obligations to Midland.
 
 See id.
 

 On August 1, 2002, upon motion of Enron and its subsidiaries, the bankruptcy court set October 15, 2002, as the deadline, or “bar date,” by which creditors would be required to file proofs of claim against the debtors.
 
 See In re Enron Corp.,
 
 No. 01-16034, order at 3 (Bankr.S.D.N.Y. Aug. 1, 2002) (“Bar Date Order”) (order stating that “October 15, 2002 at 5:00 p.m. (New York City Time) shall be the last date and time by which Proofs of Claim relating to these Debtors may be filed”). The order specified that “Proofs of Claim will be deemed timely filed only if
 
 actually received
 
 by the Enron Claims Docketing Center on or before the applicable Bar Date.”
 
 Id.
 
 (emphasis in original). And it cautioned that
 

 any holder of a claim against a Debtor who is required to but fails to file a proof of claim for such claim in accordance with this Order on or before the applicable Bar Date shall be forever barred, estopped and enjoined from asserting such claim against such Debtor (or filing a proof of claim with respect thereto) and such Debtor and its respective property shall be forever discharged from any and all indebtedness or liability with respect to such claim.
 

 Id.
 
 at 5-6.
 

 The order required that Enron and its affiliates “shall mail, on or before August 16, 2002, [a] Bar Date notice” to potential creditors.
 
 Id.
 
 at 3. That notice, which Enron mailed to creditors on August 10, 2002, and which was thereafter published in various national newspapers,
 
 see In re Enron Corp.,
 
 298 B.R. at 517, was captioned “NOTICE OF BAR DATE REQUIRING FILING OF PROOFS OF CLAIM AGAINST DEBTORS LISTED ON EXHIBIT A ON OR BEFORE OCTOBER 15, 2002 AT 5:00 P.M. (NEW YORK TIME).”
 
 See
 
 Notice of Bar Date at 1,
 
 In re Enron Corp.,
 
 298 B.R. 513 (No. 01-16034) (the “Bar Date Notice”).
 

 The notice instructed creditors: “If you assert Claims against more than one Debt- or, you must file a separate Proof of Claim with respect to each such Debtor. In addition, you must identify on your proof of claim form the particular Debtor against which your Claim is asserted.”
 
 Id.
 
 at 2 (emphasis in original). And it contained a paragraph headed “CONSEQUENCES OF FAILURE TO FILE PROOF OF CLAIM,” that stipulated as follows:
 

 
 *120
 
 Any entity that is required to file a Proof of Claim, but that fails to do so by the applicable Bar Date described in this Notice, shall be forever barred, estopped and enjoined from the following:
 

 a. asserting any Claim against a Debt- or that the entity has that (i) is in an amount that exceeds the amount, if any, that is identified in the Schedules on behalf of such entity as undisputed, non-contingent and liquidated or (ii) is of a different nature or a different classification than any Claim identified in the Schedules on behalf of such entity (any such Claim being referred to in this Notice as an
 
 “Unscheduled Claim”);
 
 or
 

 b. voting upon, or receiving distributions under, any plan or plans of reorganization in these chapter 11 cases in respect of an Unscheduled Claim.
 

 Id.
 
 at 2-3 (emphasis in original). The paragraph continued: “If it is unclear from the Schedules whether your Claim is disputed, contingent or unliquidated as to amount or whether it is otherwise properly listed and classified, you must file a proof of claim on or before the applicable Bar Date.”
 
 Id.
 
 at 3 (emphasis in original). Schedule F of Enron’s financial disclosures, in turn, listed Midland’s “Guarantee Claim” as “contingent” and “unliquidated,” and listed the amount of the claim as “unknown.” Sch. F: Creditors Holding Unsecured Nonpriority Claims at 624,
 
 In re Enron Corp.,
 
 298 B.R. 513 (No. 01-16034).
 

 On October 10, 2002, five days before the bar date, Midland filed with the bankruptcy court proof of an unsecured claim against ENA in the amount of $12,567,557 based on ENA’s failure to deliver natural gas from April 1 to April 19, 2002, and for damages resulting from ENA’s rejection of its remaining obligations under the natural gas purchase agreement.
 
 See
 
 Proof of Claim, Ex. A 2-3,
 
 In re Enron Corp.,
 
 298 B.R. 513 (No. 01-16034). Midland’s filing included a “reservation of rights” provision pursuant to which it purported to “reserve[ ] the right to amend, supplement, or otherwise modify this Proof of Claim at any time.”
 
 Id.
 

 Midland did not, however, attempt to file a proof of claim against Enron under the guaranty until April 24, 2003 — some six months after the bar date. At that time, Midland filed a motion seeking “to assert the 1996 Guaranty against Enron Corp. as either an amendment to the Claim [against ENA] or as a late-filed claim.” Midland Mot. to Amend at 5. Midland argued that its failure to file a timely claim against Enron under the guaranty “resulted solely from inadvertence,”
 
 id.,
 
 because “Midland and its counsel were so heavily focused upon and involved in negotiations with personnel of [ENA] and its attorneys regarding the rejection of the 1996 Agreement and the assumption and assignment of [an unrelated agreement] that they neglected to include with the [proof of claim against ENA] a claim [against Enron] under the 1996 Guaranty.”
 
 Id.
 
 at 3. The amended or late-filed claim could not “under any circumstance come as a surprise to [ENA], Enron Corp., its affiliated debtors or their creditors,” Midland argued, because “Midland’s rights and remedies under the 1996 Guaranty were well known by business personnel and counsel for Enron Corp. and [ENA, and because] the 1996 Guaranty was disclosed on Enron Corp.’s schedules of financial affairs.”
 
 Id.
 
 Midland also contended that neither company could be prejudiced by its delay because they had not yet filed a disclosure statement or plan of reorganization.
 
 Id.
 
 at 5.
 

 Enron and ENA objected to Midland’s motion, and the bankruptcy court therefore conducted a hearing on May 22, 2003. On July 11, 2003, Enron and various of its subsidiaries filed a disclosure statement
 
 *121
 
 and a draft reorganization plan. On September 17, 2003, the bankruptcy court denied Midland’s motion citing the substantial length of the delay, the lack of a “genuine reason” for the delay, and the potential prejudice to Enron and its reorganization proceedings from the possible opening of the “floodgates” to similar late claims.
 
 In re Enron Corp.,
 
 298 B.R. at 526. Following a hearing, the district court denied Midland’s appeal, concluding that “the purpose of a bar date has to be given great deference because, especially in a bankruptcy as complicated as [that] of Enron and its subsidiaries, finality means you have a definite field on which to work.” May 19, 2004, Hearing Tr. at 16. It is from that decision that Midland appeals.
 

 In the meantime, Enron’s fifth amended plan of reorganization, filed in January 2004, was confirmed on July 15, 2004.
 

 DISCUSSION
 

 On appeal, Midland argues principally that the bankruptcy court misapplied the test for “excusable neglect” set forth by the United States Supreme Court in
 
 Pioneer Investment Services Co. v. Brunswick Associates L.P.,
 
 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), by improperly speculating that granting Midland’s motion would “open the floodgates” to similar late-filed claims, thereby prejudicing Enron and having an adverse impact on the bankruptcy proceedings generally. Midland also contends that Enron had notice of Midland’s claim well before the bar date, and that the bankruptcy court’s bar date order “was not reasonably calculated to put creditors on notice of the multiple-filing requirement” for claims against different Enron entities. Appellant’s Br. at 8.
 

 I. “Excusable Neglect” for Late-Filed Claims
 

 The Federal Rules of Bankruptcy Procedure provide that
 

 when an act is required or allowed to be done at or within a specified period ... by order of court, the court for cause shown may at any time in its discretion ... on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect.
 

 Fed. R. Bankr.P. 9006(b)(1). Rule 9006 governs the admission of proofs of claim filed after a court-ordered bar date.
 
 See Pioneer,
 
 507 U.S. at 382, 113 S.Ct. 1489 (noting that Rule 9006(b)(1) “empowers a bankruptcy court to permit a late filing if the movant’s failure to comply with an earlier deadline ‘was the result of excusable neglect’ ”). “The burden of proving excusable neglect lies with the late-claimant.”
 
 Jones v. Chemetron Corp.,
 
 212 F.3d 199, 205 (3d Cir.2000);
 
 see also In re Andover Togs, Inc.,
 
 231 B.R. 521, 549 (Bankr.S.D.N.Y.1999).
 

 A. The
 
 Pioneer
 
 Test
 

 In
 
 Pioneer,
 
 the Supreme Court set out the parameters of what it termed the “somewhat elastic concept” of “excusable neglect.” 507 U.S. at 392, 113 S.Ct. 1489 (citation and internal quotation marks omitted). The Court noted that “reading Rule 9006(b)(1) inflexibly to exclude every instance of an inadvertent or negligent omission would ignore the most natural meaning of the word ‘neglect’ and would be at odds with the accepted meaning of that word in analogous contexts.”
 
 Id.
 
 at 394-95. At the same time, it observed that the Rule’s requirement that a party’s “neglect” be “excusable” would likely serve to “deter creditors or other parties from freely ignoring court-ordered deadlines in the hopes of winning a permissive reprieve under Rule 9006(b)(1).”
 
 Id.
 
 at 395, 113 S.Ct. 1489.
 

 After delineating the spectrum of “possible explanations for a party’s failure to
 
 *122
 
 comply with a court-ordered filing deadline” — from “act[s] of God” on one end to a party’s deliberate choice “to flout a deadline” on the other,
 
 id.
 
 at 387-88, 113 S.Ct. 1489 — the
 
 Pioneer
 
 Court made clear that excusable neglect was, in its view, “not limited to situations where the failure to timely file is due to circumstances beyond the control of the filer,”
 
 id.
 
 at 391, 113 S.Ct. 1489. Instead, it found that “Congress plainly contemplated that the courts
 
 would be 'permitted,
 
 where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness,”
 
 id.
 
 at 388, 113 S.Ct. 1489 (emphasis added), even though “inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute ‘excusable’ neglect,”
 
 id.
 
 at 392, 113 S.Ct. 1489. “Because Congress has provided no other guideposts for determining what sorts of neglect will be considered ‘excusable,’ ” the Court “conclude[d] that the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party’s omission,” including “[1] the danger of prejudice to the debtor, [2] the length of the delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith.”
 
 Id.
 
 at 395, 113 S.Ct. 1489 (citation omitted).
 

 Applying that test to the facts before it, the
 
 Pioneer
 
 Court allowed a claim filed twenty days after the bar date imposed by the bankruptcy court where the notice of that date consisted of a single, “inconspicuous” sentence in a document entitled “Notice for Meeting of Creditors.”
 
 Id.
 
 at 386, 398, 113 S.Ct. 1489 (citations and internal quotation marks omitted). Emphasizing the “ ‘dramatic ambiguity’ in the notification,”
 
 id.
 
 at 398, 113 S.Ct. 1489 (citation omitted), the Court remarked that it “consider[ed] significant that the notice of the bar date ... was outside the ordinary course in bankruptcy cases,” in which “ordinarily the bar date ... should be prominently announced and accompanied by an explanation of its significance,”
 
 id.
 
 At the same time, the Court gave “little weight,”
 
 id.,
 
 to the explanation provided by the late-claimants’ attorney who contended that he was “unaware” of the bar date until after it had passed because it “came at a time when he was experiencing ‘a major and significant disruption’ in his professional life caused by his withdrawal from his former law firm,” and “did not have access to his copy of the case file,”
 
 id.
 
 at 384, 113 S.Ct. 1489. And the Court noted that “were there any evidence of prejudice to [the debtor] or to judicial administration in this case, or any indication at all of bad faith, we could not say that the Bankruptcy Court abused its discretion in declining to find the neglect to be ‘excusable.’ ”
 
 Id.
 
 at 398, 113 S.Ct. 1489.
 

 B. “Excusable Neglect”
 
 Posi-Pioneer
 

 We have “taken a hard line” in applying the
 
 Pioneer
 
 test.
 
 Silivanch v. Celebrity Cruises, Inc.,
 
 333 F.3d 355, 368 (2d Cir.2003), ce
 
 rt. denied sub nom. Essef Corp. v. Silivanch,
 
 540 U.S. 1105, 124 S.Ct. 1047, 157 L.Ed.2d 890 (2004). Although
 
 Sili-vanch
 
 did not involve a bankruptcy proceeding, we applied the four
 
 Pioneer
 
 factors in that case to evaluate whether the late filing of an appeal in a tort action was justified by “excusable neglect.” We observed that in the “typical” case, “three of the
 
 [Pioneer
 
 ] factors” — the length of the delay, the danger of prejudice, and the movant’s good faith — “usually weigh in favor of the party seeking the extension.”
 
 Id.
 
 at 366, 113 S.Ct. 1489. We noted, though, that “we and other circuits have focused on the third factor: ‘the reason for the delay, including whether it was within the reasonable control of the movant.’ ”
 
 Id.
 
 
 *123
 
 (quoting
 
 Pioneer,
 
 507 U.S. at 395, 113 S.Ct. 1489). And we cautioned “that the equities will rarely if ever favor a party who fail[s] to follow the clear dictates of a court rule,” and “that where the rule is entirely clear, we continue to expect that a party claiming excusable neglect will, in the ordinary course, lose under the
 
 Pioneer
 
 test.”
 
 Id.
 
 at 366-67, 113 S.Ct. 1489 (citations and internal quotation marks omitted, alteration in original);,
 
 see also id.
 
 at 367 n. 7, 113 S.Ct. 1489 (“ ‘[T]he four
 
 Pioneer
 
 factors do not carry equal weight; the excuse given for the late filing must have the greatest import. While prejudice, length of delay, and good faith might have more relevance in a close[ ] case, the reason-for-delay factor will always be critical to the inquiry.’ ” (quoting
 
 Graphic Communications Int’l Union v. Quebecor Printing Providence, Inc.,
 
 270 F.3d 1, 5-6 (1st Cir.2001)) (alterations in original)).
 

 Accordingly, in
 
 Silivanch
 
 we thought ourselves “compelled ... to conclude that the district court abused its discretion” in finding excusable neglect where the basis for the claim was that the appellant’s attorney had mistakenly relied “on a remark by counsel for another party” concerning the date by which a notice of appeal had to be filed.
 
 Id.
 
 at 370. It is not only a question of the need for finality.
 

 We operate in an environment ... in which substantial rights may be, and often are, forfeited if they are not asserted within time limits established by law. Judges, of course, make mistakes. We, like the district court, have considerable sympathy for those who, through mistakes' — counsel's inadvertence or their own — lose substantial rights in that way.
 
 [1]
 
 And there is, indeed, an institutionalized but limited flexibility at the margin with respect to rights lost because they have been slept on. But the legal system would groan under the weight of a regimen of uncertainty in which time limitations were not rigorously enforced- — -where every missed deadline was the occasion for the embarkation on extensive trial and appellate litigation to determine the equities of enforcing the bar.
 

 Id.
 
 at 367-68 (footnote in original, renumbered; other footnotes omitted).
 

 As we observed in
 
 Silivanch, id.
 
 at 370 (collecting cases), other courts have, for the most part, adopted a similar “hard line” to applying
 
 Pioneer
 
 that emphasizes the reason for the delay.
 
 See, e.g., United States v. Torres,
 
 372 F.3d 1159, 1162-63 (10th Cir.2004) (concluding that the district court abused its discretion in finding excusable neglect notwithstanding the fact that three
 
 Pioneer
 
 factors “weighted] in favor” of such a finding, because “fault in the delay remains a very important factor — perhaps the most important single factor — in determining whether neglect is excusable” (citation and internal quotation marks omitted));
 
 Graphic Communications Int’l Union,
 
 270 F.3d at 5-6 (reaffirming that “[t]he four
 
 Pioneer
 
 factors do not carry equal weight; the excuse given for the late filing must have the greatest import,” and noting as a result that “when a party’s or counsel’s misunderstanding of clear law or misreading of an unambiguous
 
 *124
 
 judicial decree is the reason for the delay ... we have continued to uphold findings of ‘no excusable neglect’ where the court cited the absence of unique or extraordinary circumstances” (citation and internal quotation marks omitted, alteration in original));
 
 Lowry v. McDonnell Douglas Corp.,
 
 211 F.3d 457, 463 (8th Cir.) (“[A]t the end of the day, the focus must be upon the nature of the neglect. Therefore we must examine carefully the reasons [given] for missing the deadline.”),
 
 cert. denied,
 
 531 U.S. 929, 121 S.Ct. 309, 148 L.Ed.2d 248 (2000);
 
 In re Au Coton, Inc.,
 
 171 B.R. 16, 18 (S.D.N.Y.1994) (concluding that “it was within the bankruptcy court’s discretion to disallow” a claim filed eighteen days late where all the
 
 Pioneer
 
 factors favored the creditor except the reason for the delay).
 
 But see Pincay v. Andrews,
 
 389 F.3d 853 (9th Cir.2004) (en banc) (applying flexible reading of
 
 Pioneer
 
 and affirming trial court’s decision to allow late-filed notice of appeal based on excusable neglect consisting of paralegal’s misreading of the rule governing the deadlines for appeal),
 
 cert. denied,
 
 — U.S. -, 125 S.Ct. 1726, 161 L.Ed.2d 602 (2005);
 
 In re 50-Off Stores, Inc.,
 
 220 B.R. 897, 901 (Bankr.W.D.Tex.1998) (noting that in conducting the
 
 Pioneer
 
 analysis, “[n]o single circumstance controls, nor is a court to simply proceed down a checklist ticking off traits. Instead, courts are to look for a synergy of several factors that conspire to push the analysis one way or the other.”);
 
 In re Sacred Heart Hosp. of Norristown,
 
 186 B.R. 891, 895 (Bankr.E.D.Pa.1995) (“[A] long and logically unjustified delay which nevertheless has no significant impact on the debtor’s case should ... often be deemed excusable.”).
 

 II. Standard of Review
 

 “In an appeal from a district court’s review of a bankruptcy court decision, we review the bankruptcy court decision independently, accepting its factual findings unless clearly erroneous but reviewing its conclusions of law
 
 de novo.” In re AroChem Corp.,
 
 176 F.3d 610, 620 (2d Cir.1999). Bankruptcy court decisions to deny a request to file late are reviewed for abuse of discretion.
 
 See Pioneer,
 
 507 U.S. at 398, 113 S.Ct. 1489 (“[W]ere there any evidence of prejudice ... or any indication at all of bad faith, we could not say that the Bankruptcy Court abused its discretion.”);
 
 In re Drexel Burnham Lambert Group, Inc.,
 
 146 B.R. 84, 87 (S.D.N.Y.1992) (“Since the determination of whether or not a case is an appropriate one in which to grant a request to file late is expressly left to the Bankruptcy Court’s discretion, this Court may review the Bankruptcy Court’s decision for abuse of discretion only.”);
 
 In re Integrated Res., Inc.,
 
 157 B.R. 66, 72 (S.D.N.Y.1993) (“Matters concerning decisions within the discretion of bankruptcy judges will not be disturbed by the district court unless the district court finds that no reasonable man could agree with the bankruptcy judge’s decision.”);
 
 cf. Silivanch,
 
 333 F.3d at 362 (“A district court’s order granting or denying motions [for extension of time to file appeals] is reviewed for abuse of discretion.”) (citation and internal quotation marks omitted).
 

 Midland contends that we should review the bankruptcy court’s decision
 
 de novo
 
 because the court “failed to exercise any real discretion” insofar as it did not “analyze the evidence in the Motion record or Enron docket.” Appellant’s Br. at 15. Midland’s position, however, is not supported by the bankruptcy court’s opinion, which indicates that the court — having presided over the complex Enron proceedings for nearly two years as of the time it issued the order appealed from here— carefully weighed the history of Midland’s relationship with Enron and ENA, as well
 
 *125
 
 as Midland’s explanation for its delay in filing the claim against Enron and the relevant legal standards, before issuing an opinion spanning some twenty typewritten pages.
 

 The bankruptcy court specifically credited Midland’s arguments that it acted in good faith,
 
 see In re Enron Corp.,
 
 298 B.R. at 526, that its claim was “not substantial in relation to the [Enron] estate,”
 
 id.
 
 at 525, and that the claim was “filed before [Enron and its subsidiaries] filed their proposed plan of reorganization and disclosure statement,”
 
 id.
 
 at 525-26. But the court also noted that Midland had been provided with “adequate notice” of the bar date, that its delay of more than six months after that date was “substantial,” and that its explanation for missing the deadline was ordinary “inadvertence” based on the fact that “it was distracted by extensive negotiations regarding [ENA’s] rejection of the Purchase Agreement and assignment and assumption of [an unrelated agreement].”
 
 Id.
 
 at 526. The court observed further that Enron and its subsidiaries “might be parties to agreements with guarantees or guarantors of such agreements involving other Debtors,” such that “allowing late-filed proof of claims based on such guarantee or guarantor relationships would adversely affect the Debtors’ assessment of their liabilities as well as negatively impact their bankruptcy proceedings.”
 
 Id.
 
 The court did not cite specifically to the record in making this observation, but the record amply supports it.
 

 Enron contends in its brief on appeal that some “26 percent of all [Enron-related] debtors, including ENA, received Enron credit support in the form of guaranties,” Appellees’ Br. at 30 n. 13, a fact Midland does not challenge and of which the bankruptcy court, given its familiarity with the case, must have been aware. The court thus plainly reviewed the record before it, made inferences based on that record, and reached a conclusion based on those facts and inferences. Midland may disagree with that conclusion, and may argue that the court exceeded its permissible discretion in reaching it, but we think that its contention that the court failed to exercise its discretion at all is entirely without merit.
 

 We note in passing that the two cases that Midland cites in support of this argument do not help it. In the first,
 
 Thomas v. Continental Casualty Co.,
 
 7 F.Supp.2d 1048 (C.D.Cal.1998), a California district court concluded that while the “default rule” called for
 
 de novo
 
 review of an ERISA plan administrator’s decision, “a plan with any single discretionary element requires abuse of discretion review, but only as to those decisions made by the administrator governed by the discretionary provisions of the plan,”
 
 id.
 
 at 1054 (emphasis omitted). In the second,
 
 Seman v. FMC Corp. Retirement Plan for Hourly Employees,
 
 334 F.3d 728 (8th Cir.2003), the Eighth Circuit decided that “if an ERISA plan gives its administrator discretion to decide certain issues and the administrator fails to render a decision on those issues, judicial review of those issues is de novo,”
 
 id.
 
 at 733. Neither of these cases has obvious relevance in the bankruptcy context, in which the discretion of a bankruptcy court to allow or disallow late-filed claims is well-established, or to the instant case, in which the bankruptcy court explicitly rendered a decision on the matters before it. Accordingly, we proceed to review the bankruptcy court’s decision for abuse of discretion.
 

 III. The Bankruptcy Court’s Application of
 
 Pioneer
 

 The bankruptcy court found no evidence that Midland did not act in good faith, and
 
 *126
 
 Enron does not dispute this point. We therefore focus on the court’s application of the remaining three prongs of the
 
 Pioneer
 
 test.
 

 A. Reason for the Delay
 

 Midland’s motion to amend its proof of claim indicated that its failure to file a timely claim against Enron “resulted solely from inadvertence,” which it attributed to the fact that it and “its counsel were so heavily focused upon and involved in negotiations with personnel of Enron North America and its attorneys regarding the rejection of the 1996 Agreement and the assumption and assignment of [an unrelated agreement], that they neglected to include with the Midland Claim a claim under the 1996 Guaranty.” Midland Mot. to Amend at 3, 5. The bankruptcy court rejected this explanation as not a “genuine reason for the delay” and concluded that the “reason for the delay” factor therefore favored Enron, noting that the “Debtors provided Midland with adequate notice of the Bar Date.”
 
 In re Enron Corp.,
 
 298 B.R. at 526.
 

 As we have noted, “inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute ‘excusable’ neglect.”
 
 Pioneer,
 
 507 U.S. at 392, 113 S.Ct. 1489. Similarly, preoccupation or an excessive workload does not typically render a mistake excusable.
 
 Cf. id.
 
 at 398, 113 S.Ct. 1489 (noting that “we give little weight to the fact that counsel was experiencing upheaval in his law practice at the time of the bar date”);
 
 see also In re Eagle-Picher Indus., Inc.,
 
 158 B.R. 713, 715-16 (Bankr.S.D.Ohio 1993) (rejecting a claim filed two weeks late where the only explanation was an “overworked and underfunded” staff).
 

 Apparently recognizing the weakness of its inadvertence argument, Midland advances for the first time on appeal two additional explanations for its failure to file a timely claim. First, Midland contends that while the debtors’
 
 motion
 
 seeking a bar date order included a provision requesting that separate claims be filed against each Enron entity, the
 
 order itself,
 
 as issued by the bankruptcy court, did not specifically contain such a provision. Appellant’s Br. at 8. Midland asserts that the omission of the requirement for separate claims in the court’s bar date order “implied that the Bankruptcy Court had rejected the Debtors’ requested multiple-filing requirement.”
 
 Id.
 
 Second, Midland argues that
 

 the universal creditor expectation [at the time it filed its proof of claim against ENA] was that the Debtors’ estates would be substantively consolidated as part of a plan of reorganization, and therefore that a creditor’s claim against any individual Enron entity would be accorded parity of distribution with claims against other Enron entities— regardless which Enron entity had originally been hable to it.
 

 Id.
 
 Because it anticipated that all the payouts would thus derive from a common pool, Midland apparently thought it would not matter against which entity it asserted its claim. It was only after “Midland began to believe that the Enron entities might not all be substantively consolidated” that it filed its motion to amend its claim or file a late claim against Enron.
 
 Id.
 
 at 8-9.
 

 “The law is well established that a federal appellate court will generally not consider an issue or argument not raised [in the district court].”
 
 Kamagate v. Ashcroft,
 
 385 F.3d 144, 151 (2d Cir.2004). While we therefore decline to consider Midland’s belated explanations for its belated filing, we pause to make three observations about them.
 

 
 *127
 
 First, Midland’s contention that the bankruptcy court impliedly rejected Enron’s request for a multiple-filing requirement is at odds with the bankruptcy court’s order, which specifically “authorized and approved in all respects” the relief requested in Enron’s bar date motion. Bar Date Order at 2.
 

 Second, while the bar date
 
 order
 
 did not mention the multiple-filing requirement, not only the bar date
 
 notice
 
 but also the
 
 instructions
 
 for filing a proof of claim explicitly required separate claims for different Enron entities — the former in boldface type, the latter in capital letters.
 
 See
 
 Bar Date Notice at 2; Mot. of the Debtors for an Order Pursuant to Bankruptcy Rules 2002(a)(7), 2002(1), and 3003(c)(3) Establishing Deadlines for Filing Proofs of Claim and Approving the Form and Manner of Providing Notice Thereof at 2, Ex. D 3,
 
 In re Enron Corp.,
 
 298 B.R. 513 (No. 01-16034) (“Bar Date Motion”). This case thus involves no ambiguity, much less a “dramatic ambiguity,”
 
 Pioneer,
 
 507 U.S. at 398, 113 S.Ct. 1489, relating to the requirement that creditors submit multiple proofs of claim for different Enron entities.
 

 Third, Midland’s contention that it “mistakenly rel[ied] on the ... anticipated substantive consolidation” of the Enron bankruptcies, Appellant’s Br. at 24, is inconsistent with its claim of inadvertence insofar as it suggests a “conscious, tactical decision” to file a single claim on the basis of what turned out to be an erroneous assumption.
 
 Cf. In re Sacred Heart Hosp. of Norristown,
 
 186 B.R. at 896 (referring to cases in which “courts declined attempts to extend bar dates after the respective claimants were found to have made conscious, tactical decisions not to file ... timely claims”) (citing
 
 In re Bicoastal Corp.,
 
 176 B.R. 966, 971-72 (Bankr.M.D.Fla.1994));
 
 In re Mother Hubbard, Inc.,
 
 152 B.R. 189, 193-94 (Bankr.W.D.Mich.1993) (“Although [the creditor] may have made a bad decision in failing to timely file his claim, making such a conscious decision is not ‘excusable’. Indeed [the creditor’s] decision is not ‘neglect’ — it was a voluntary omission within his sole control.”).
 

 For the foregoing reasons, we cannot conclude that the bankruptcy court abused its discretion in finding that Midland provided an inadequate explanation for its failure to file a timely claim, and that the “reason for the delay” prong of the
 
 Pioneer
 
 test therefore favored Enron.
 

 B. Length of the Delay
 

 The bankruptcy court concluded that the six months that elapsed between the bar date and Midland’s attempt to file the late claim constituted a “substantial” delay, noting that the purpose of the bar date order was to “exclude such late claims in order to provide the Debtors and their creditors with finality to the claims process and permit the Debtors to make swift distributions under any confirmed plan of reorganization.”
 
 In re Enron Corp.,
 
 298 B.R. at 526. The court thus found that “the length of delay factor also weighs in favor of the Debtors.”
 
 Id.
 
 Midland argues that the bankruptcy court provided “no reason” for its finding, which the company contends was “unsupported ... by the Motion record.” Appellant’s Br. at 25-26. Midland also notes that no reorganization plan had been filed by the time its claim was submitted.
 
 Id.
 
 at 25.
 

 We have previously acknowledged the “essential function” of bar date orders in bankruptcy proceedings.
 
 See In re Hooker Invs., Inc.,
 
 937 F.2d 833, 840 (2d Cir.1991) (“[A] bar order does not function merely as a procedural gauntlet, but as an integral part of the reorganization process. If individual creditors were permitted to postpone indefinitely the effect of a
 
 *128
 
 bar order ... the institutional means of ensuring .the sound administration of the bankruptcy estate would be undermined.” (citation and internal quotation marks omitted)). While we have acknowledged that the precise dollar amount of a creditor’s claim “may not be finally determined until adversary proceedings have been concluded,” we have explained that bar dates nonetheless “served the important purpose of enabling the parties to a bankruptcy case to identify with reasonable promptness the identity of those making claims against the bankruptcy estate and the general amount of the claims, a necessary step in achieving the goal of successful reorganization.”
 
 Id.; see also In re Drexel Burnham Lambert Group, Inc.,
 
 129 B.R. at 26 (“Each creditor is required to file its proof of claim early in the bankruptcy case so that the trustee, the creditors, and the debtor can negotiate, formulate, and fund a plan of reorganization. Complex and exhaustive negotiations have been taking place. Absent finality, reorganization would be impossible.”).
 

 Notwithstanding the centrality of bar dates, however, neither we nor — as far as our research discloses — any other court has established a bright-line rule governing when the lateness of a claim will be considered “substantial.”
 
 But cf. In re O’Brien Envtl. Energy, Inc.,
 
 188 F.3d 116, 130 (3d Cir.1999) (suggesting that the length of a delay should be evaluated “in absolute terms”). While some courts have allowed claims filed as late as two years after the bar date,
 
 see, e.g., In re Beltrami Enters., Inc.,
 
 178 B.R. 389, 392 (Bankr.M.D.Pa.1994), others have rejected claims filed just one day late,
 
 see, e.g., In re Kmart Corp.,
 
 381 F.3d 709, 714-715 (7th Cir.2004),
 
 cert. denied sub nom. Simmons v. Kmart Corp.,
 
 — U.S. -, 125 S.Ct. 933, 160 L.Ed.2d 780 (2005). In determining how long is too long, courts generally consider the degree to which, in the context of a particular proceeding, the delay “may disrupt the judicial administration of the case.”
 
 In re Infiltrator Sys., Inc.,
 
 241 B.R. 278, 281 (Bankr.D.Conn.1999);
 
 see also In re O’Brien Envtl. Energy Inc.,
 
 188 F.3d at 130 (recognizing that “it is proper to consider the delay’s effect on the judicial proceedings”). Some courts have also suggested that a relevant consideration is whether a reorganization plan has been filed or confirmed by the time a late claim is submitted.
 
 See In re Infiltrator Sys.,
 
 241 B.R. at 281 (“Where ... the debtor has not yet filed a plan and is still engaged in assessing the validity and amounts of the timely filed claims, the impact upon administration of the case ... is not significant.”).
 
 But see In re Kmart,
 
 381 F.3d at 713 (affirming the disallowance of a late-filed claim notwithstanding the fact that the debtor was “on full notice of [the creditor’s] claim and could have easily taken it into account when it drafted its reorganization plan”).
 

 We agree that the lateness of a claim must be considered in the context of the proceeding as a whole. It stands to reason, for example, that in some circumstances a claim filed six
 
 months
 
 late will be more disruptive to a reorganization process than one filed six
 
 weeks
 
 late. Under other conditions, however, a claim filed six months late will not be disruptive at all— if, for example, the proceeding has come to a temporary halt for other reasons — while one filed six weeks late, while the proceedings are in full swing, will threaten to upset the entire process.
 
 See Linder v. Trump’s Castle Assocs.,
 
 155 B.R. 102, 108 n. 10 (D.N.J.1993) (“[T]he degree to which prejudice and interference with judicial administration may increase as the tardiness of the claim increases will depend on the time frame and complexity of the case. In some cases a claim that is six months late will create substantial prejudice and inter
 
 *129
 
 ference, and in others it would create none.”)- In making this determination, we do not think that whether a claim is submitted before the date on which a reorganization plan is filed ought, ordinarily, to be conclusive. Magnifying the importance of that date necessarily minimizes the importance of the bar date, and fails to recognize adequately the practical centrality to bankruptcy reorganizations of negotiations among creditors and debtors.
 

 At the same time, we agree with the Third and Seventh Circuits to the extent that their decisions in
 
 O’Brien Environmental Energy
 
 and
 
 Kmart
 
 may be taken to suggest that even if the “length of the delay” and extent of disruptiveness are often related, the evaluation of lateness should, at least to some extent, also take into account the creditor’s explanation for the delay. Thus, a long delay (presumably more likely in most circumstances to occasion more disruption) with a strong explanation might be more acceptable than a short delay with a weak explanation — even if both explanations are credible. Similarly, an explanation that a court deems legitimate on its face — and that might suffice for a delay of a few weeks — might nonetheless not suffice for a delay of a few months where increased disruption is likely to result. In both instances, the “reason for the delay” might weigh in favor of the creditor, while the “length of the delay” might weigh in favor of the debtor, simply because the explanation, though legitimate to explain
 
 some
 
 lateness, does not suffice to explain the
 
 degree
 
 of lateness. By the same token, where an explanation is nonexistent, or not credible,
 
 both
 
 the “reason for the delay” and the “length of the delay” factors might weigh in favor of the debtor, even if the delay is, in absolute terms, quite short.
 

 In considering these issues, finally, we are particularly reluctant — absent evident arbitrariness — to substitute our judgment for that of the bankruptcy judge who has presided over the proceedings, who is most familiar with the parties and the potential impact of any late-filed claim, and whose ability to oversee an efficient reorganization would be undermined by the very process of second-guessing itself.
 

 In the instant case, Midland filed its motion to amend on April 24, 2003, Enron’s preliminary reorganization plan was filed on July 11, 2003, and the bankruptcy court rejected Midland’s motion on September 17, 2003. Enron amended its reorganization plan for the first time on September 18, 2003, and the plan was finally confirmed, after a total of five amendments, on July 15, 2004. Midland contends that the late inclusion of its $12.5 million claim would not have disrupted the proceedings because the claim is
 
 de min-imis
 
 in the context of the vastness of the Enron bankruptcy, and because including it would simply have involved plugging the number into the computer program used to calculate creditor distributions and allowing the program to spit out a result. We find this contention unpersuasive because it ignores the arduous process of valuing assets, validating claims, and negotiating a compromise among a host of creditors.
 

 If Midland’s claim was submitted long before Enron’s final reorganization plan was filed or confirmed, it was nonetheless submitted long after the negotiations required to develop that plan had begun. The bankruptcy court could well have concluded that the negotiations were at a sufficiently advanced stage that the belated introduction of a multimillion-dollar claim would have a disruptive effect.
 
 Cf. In re Am. Classic Voyages Co.,
 
 405 F.3d 127, 133 (3d Cir.2005) (“Thousands of individual claims are outstanding against Debtors; the sheer scale presents a formi
 
 *130
 
 dable problem of management. The strict bar date provided by the Bankruptcy Court was intended, in part, to facilitate the equitable and orderly intake of those claims”). Accordingly, while the court’s abbreviated explanation of its finding that six months constituted an unacceptable delay was less than exhaustive, we cannot conclude — against the backdrop of an exceedingly complex reorganization, and given the absence of any persuasive explanation for the delay — that the court abused its discretion in finding against Midland on this factor.
 

 C. Prejudice
 

 While
 
 Pioneer
 
 itself “gives us little guidance as to what prejudice actually is,”
 
 In re O’Brien Envtl. Energy, Inc.,
 
 188 F.3d at 126, we agree with the observation that the Court must have had more in mind than “a simple dollar-for-dollar depletion of assets otherwise available for timely filed claims,”
 
 In re R.H. Macy & Co., Inc.,
 
 166 B.R. 799, 802 (S.D.N.Y.1994). “[O]therwise, virtually all late filings would be condemned by this factor[, because] they seek to share, with timely filed claims, in the bankrupt’s limited resources.”
 
 Id. See also In re O’Brien Envtl. Energy, Inc.,
 
 188 F.3d at 126 (“We believe that
 
 Pioneer
 
 requires a more detailed analysis of prejudice which would account for more than whether the Plan set aside money to pay the claim at issue.”);
 
 Pratt v. Philbrook,
 
 109 F.3d 18, 22 (1st Cir.1997) (“Of course, it is always prejudicial for a party to have a case reopened after it has been closed advantageously by an opponent’s default. But we do not think that is the sense in which the term ‘prejudice’ is used in
 
 Pioneer.”).
 
 At the same time, however, the size of the claim cannot be irrelevant to the analysis, and some courts have taken into account whether allowance of a particular late claim would “jeopardize the success of the reorganization,” by, for example, “forc[ing] the return of ... amounts already paid out under the confirmed Plan, or affectfing] the distribution to creditors and equity holders.”
 
 In re O’Brien Envtl. Energy, Inc.,
 
 188 F.3d at 128. Other factors include whether the debtor had advance knowledge of the claim,
 
 see, e.g., id.; In re Keene Corp.,
 
 188 B.R. 903, 910 (Bankr.S.D.N.Y.1995), and whether allowing a claim would be likely to precipitate a flood of similar claims,
 
 see, e.g., In re Kmart Corp.,
 
 381 F.3d at 714 (“[I]f the bankruptcy court allowed all late-filed claims of nearly a million dollars where a simple ‘innocent mistake’ ... was to blame for the tardiness of the proof of claim, we think Kmart could easily find itself faced with a mountain of such claims.”);
 
 In re Keene Corp.,
 
 188 B.R. at 913 (‘We would be hard-pressed to distinguish [the late-filing creditor’s] situation from any other similar creditor who ignored the Bar Date Notice, and to allow one may invite similar litigation from others. In such a case, the legal fees the estate would potentially expend in litigating these matters supports a finding of prejudice.”).
 
 But cf. In re O’Brien Envtl. Energy, Inc.,
 
 188 F.3d at 128 (“[T]o the extent [the debtor] argues that allowance of this claim would open the floodgates to other future claims against them, [the debtor] has not alleged that any other creditor promptly sought to be excused from the [bar date] order so as to now be entitled to relief on the basis of excusable neglect.”).
 

 Many of these considerations are, of course, the same as those taken into account in evaluating the length of the delay, and indeed, some courts have conflated the two analyses.
 
 See, e.g., In re Am. Classic Voyages Co.,
 
 405 F.3d at 133 (“Applying the first and second
 
 Pioneer
 
 factors, we conclude that Debtors will be prejudiced by exposure to a late claim and that the
 
 *131
 
 length of the delay would have a substantial impact on the bankruptcy proceedings.”);
 
 In re Keene Corp.,
 
 188 B.R. at 912 (“The exercise requires us to predict the adverse effect of a late claim on the debtor and on the administration of the case.”). In addition, both inquiries — but especially the prejudice factor — risk devolving into unsupported speculation, insofar as they require “a certain amount of crystal ball gazing,” with respect to the probable impact of late-filed claims.
 
 Id.
 
 We are thus mindful of the Third Circuit’s caveat that “prejudice is not an imagined or hypothetical harm; a finding of prejudice should be a conclusion based on facts in evidence.”
 
 In re O’Brien Envtl. Energy Inc.,
 
 188 F.3d at 127.
 

 In evaluating the instant case, the bankruptcy court noted that the late Midland claim was “not substantial in relation to the [Enron] estate” and was filed before Enron and its subsidiaries filed their draft plan of reorganization and disclosure statement.
 
 In re Enron Corp.,
 
 298 B.R. at 525-26. Nevertheless, the court found prejudice to Enron because “allowing late-filed proof of claims based on such guarantee or guarantor relationships would adversely affect the Debtors’ assessment of their liabilities as well as negatively impact their bankruptcy proceedings.”
 
 Id.
 
 at 526. The court also suggested, in the part of its decision applying the equitable test for
 
 amended
 
 claims,
 
 see infra
 
 note 2 & part IV, that “the Debtors would be unduly prejudiced by possibly opening the floodgates for similar late-filed guaranty claims.”
 
 Id.
 
 at 525.
 

 In disputing these findings, Midland argues: (1) that Enron had notice of its claim, and thus could have taken account of it in crafting its reorganization plan, because the claim was listed as “contingent and unliquidated” in a schedule filed as part of Enron’s Schedules of Financial Affairs; (2) that the $12.5 million claim is “outweighed 68,000 to 1” by the other claims in Enron’s $858 billion bankruptcy, Appellant’s Br. at 12, 18; and (3) that the bankruptcy court’s reference to the possible opening of the “floodgates” to claims was “wholly unsupported” by the record,
 
 id.
 
 at 25. We consider each of these arguments in turn.
 

 First, the schedule in which Midland’s claim was listed was buried in the middle of more than a thousand pages of such claims, and lists the amount of Midland’s claim as “unknown.” To suggest, on this basis, that Midland’s failure to file its proof of claim by the bar date should be absolved because Enron “knew” it was potentially liable to Midland tends to undermine the process of distinguishing between asserted and unasserted claims by requiring creditors to submit proofs of claim in order to participate in the bankruptcy reorganization.
 

 Second, while a claim of $12.5 million might seem insignificant in the face of a $900 billion bankruptcy, courts have previously upheld findings of prejudice in cases in which the late-filed claim was a small fraction of the total claims.
 
 Cf. In re Kmart Corp.,
 
 381 F.3d at 714 (affirming a finding of prejudice where a $750,000 claim was outweighed 8,000 to one by other claims in a $6 billion bankruptcy, while noting that “[p]erhaps this would be a different case had [the] claim only asserted, say, $75,000 or $80,000 in damages,” a ratio of 80,000 to one). Moreover, considered in absolute terms, $12.5 million is “no small amount.”
 
 Id.
 
 (internal quotation marks omitted). If it were, Midland would likely not invest the time or resources it has in pursuing the claim.
 

 At the same time, we cannot consider Midland’s claim in isolation. Even if that claim is negligible relative to the total size
 
 *132
 
 of Enron’s bankruptcy, the more relevant question is whether allowing one such claim would lead to “a mountain of such claims,”
 
 id.,
 
 which the bankruptcy court, having admitted the first claim, would be hard pressed to reject. Indeed, the significant percentage of Enron-affiliated debtors who received guaranties from the parent company suggests that the pool of potential claimants who, like Midland, have claims against both the subsidiaries and Enron itself as guarantor is quite large.
 

 This, then, brings us to Midland’s third concern: that the bankruptcy court strayed into improper speculation when it considered the possible opening of the “floodgates” to similar claims.
 
 [2]
 
 Midland contends that this conclusion was speculative because, at the time the court decided its motion, only six other requests for leave to file a late claim had been submitted, compared with a total of more than 28,000 claims on the claims register. Yet, Midland introduced no evidence concerning the number of
 
 potential
 
 claimants who might have been prompted to file late claims in the wake of a ruling in Midland’s favor. And, as the district court suggested at oral argument, the relative trickle of late-filed claims could well have been the result of the bankruptcy court’s anticipated enforcement of the bar date.
 
 See
 
 May 19, 2004, Hearing Tr. at 9.
 

 We also think it apparent that the bankruptcy court contemplated the possibility that Midland’s claim was not unique. In this regard, we agree with Enron that it is worth comparing the court’s treatment of Midland’s claim with that of two other creditors: PPC Industries, which filed a $165,000 claim against ENA three-and-a-half months late,
 
 see In re Enron Corp.,
 
 No. 01-16034, 2003 WL 1889042 order at 3 (Bankr.S.D.N.Y. April 8, 2003) (the “PPC Order”), and the California Independent System Operator Corp. (“CAISO”), the company that operates California’s wholesale power grid, which filed a multi-million dollar claim some five months late,
 
 see In re Enron Corp.,
 
 No. 01-16034, order at 5-7 (Bankr.S.D.N.Y. Sept. 23, 2003) (the “CAISO Order”). The court denied the former, noting that the fault for the delay lay with PPC and that there was a risk of “similarly-situated potential claimants” filing a “deluge of motions seeking similar relief.” PPC Order at 10. But the court allowed the latter — though it was both larger and later — noting that for reasons not entirely within CAISO’s control, it was not even aware that it had a claim until after the bar date, and that “the facts here are sufficiently unique that ... allowing CAISO’s late proofs of claim against the Debtors would [not] create ‘floodgate’ concerns.” CAISO Order at 12-14.
 

 As these decisions suggest, the court’s treatment of other late-filed claims, albeit not carefully explained, indicates that it was willing to recognize and admit those claims where, given its familiarity with the proceeding as a whole, it thought there was a justifiable basis for doing so. Moreover, the record provides ample support for the court’s conclusion that Midland’s claim was sufficiently large and insufficiently distinguishable from other guaranty-based claims that permitting its late
 
 *133
 
 filing would be unduly prejudicial to Enron.
 

 IV.
 
 Pioneer
 
 and the Equitable Test for Late-Amended Claims
 

 In addition to permitting bankruptcy courts to accept
 
 netv
 
 proofs of claim that are filed belatedly as the result of “excusable neglect,” the bankruptcy rules permit courts to accept late-filed
 
 amendments
 
 to timely filed proofs of claim.
 
 See
 
 Fed. R. Bankr.P. 7015 (stating that Fed.R.Civ.P. 15, governing the amendment of pleadings, “applies in adversary proceedings”);
 
 In re Trans World Airlines, Inc.,
 
 145 F.3d 124, 141 (3d Cir.1998) (noting that Rule 7015 leaves to the bankruptcy court’s discretion the decision to grant or deny leave to amend claims);
 
 see also In re Stavriotis,
 
 977 F.2d 1202, 1204 (7th Cir.1992) (same);
 
 Gens v. Resolution Trust Corp.,
 
 112 F.3d 569, 575 n. 8 (1st Cir.) (same),
 
 cert. denied sub nom. Gens v. FDIC,
 
 522 U.S. 931, 118 S.Ct. 335, 139 L.Ed.2d 260 (1997).
 

 [A]mendment to a claim is freely allowed where the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim. However, the court must subject post bar date amendments to careful scrutiny to assure that there was no attempt to file a new claim under the guise of amendment.
 

 In re Integrated Res., Inc.,
 
 157 B.R. 66, 70 (S.D.N.Y.1993) (citations omitted).
 

 Courts considering amendments to claims typically engage in a two-step inquiry: First, they examine “ ‘whether there was [a] timely assertion of a similar claim or demand evidencing an intention to hold the estate liable.’”
 
 Id.
 
 (quoting
 
 In re Black & Geddes, Inc., 58
 
 B.R. 547, 553 (S.D.N.Y.1983)). An amendment will meet this threshold if it “1) corrects a defect of form in the original claim; 2) describes the original claim with greater particularity; or 3) pleads a new theory of recovery on the facts set forth in the original claim.”
 
 In re McLean Indus., Inc.,
 
 121 B.R. 704, 708 (Bankr.S.D.N.Y.1990) (citing
 
 In re G.L. Miller & Co.,
 
 45 F.2d 115, 116 (2d Cir.1930)). Second, if an amendment does, in fact, “relate back” to the timely filed claim, courts will “examine each fact within the case and determine whether it would be equitable to allow the amendment.”
 
 In re Integrated Res., Inc.,
 
 157 B.R. at 70. Multiple factors play a role in this analysis, including whether the debtor, or other creditors, would be unduly prejudiced by the amendment, or whether, instead, other creditors would “receive a windfall” from the disallowance of the amendment, and whether the late claimant acted in good faith and the delay was justified.
 
 See id.; see also In re McLean Indus., Inc.,
 
 121 B.R. at 708. Of these, however, “[t]he critical consideration is whether the opposing party will be unduly prejudiced by the amendment.”
 
 In re Integrated Res., Inc.,
 
 157 B.R. at 70.
 

 Not surprisingly, as the bankruptcy court in the instant proceeding noted, this equitable analysis of belated
 
 amendments
 
 to claims closely resembles Pioneer’s “excusable neglect” analysis of belated
 
 new
 
 claims.
 
 See In re Enron Corp.,
 
 298 B.R. at 524-25;
 
 see also In re Brown,
 
 159 B.R. 710, 715 n. 4 (Bankr.D.N.J.1993) (“[T]he equitable analysis applied in cases decided under Rule 7015 is essentially the same analysis that the Supreme Court used to determine what is ‘excusable neglect’ under Rule 9006(b)(1) for allowing the filing of an untimely claim.”). If there is a difference between the two analyses, it is the following: While belated
 
 amendments
 
 will ordinarily be “freely allowed” where other parties will not be prejudiced, belated
 
 new
 
 
 *134
 
 claims will ordinarily be denied, even absent prejudice, unless the reason for the delay is compelling.
 

 In the instant case, Midland’s motion before the bankruptcy court was styled as a motion “to amend” its proof of claim against ENA to include its guaranty claim against Enron, though the motion requested “in the alternative” that Midland be permitted to file a new claim against Enron itself.
 
 See
 
 Midland Mot. to Amend at 7. In considering the motion, the court separated its equitable analysis of the proposed amendment from its analysis of “excusable neglect,” notwithstanding its acknowledgment that the two tests were “similar” and commanded the same result.
 
 In re Enron Corp.,
 
 298 B.R. at 524. On appeal, however, Midland — while objecting to the denial of its motion to “amend” its claim,
 
 see, e.g.,
 
 Appellant’s Br. at 11, 27— appears either to conflate the two tests or to concede that its claim against Enron should be considered a “new” claim, insofar as it contests only the court’s application of
 
 Pioneer.
 

 We need not dwell on this question, however. To be sure, there may well be instances in which a claim, considered as an amendment to an earlier-filed claim, might be permitted in a court’s equitable discretion because accepting it is not unduly prejudicial to other parties, even though the same claim, considered as a new claim under
 
 Pioneer,
 
 might not be permitted because the reason for the delay is not sufficiently compelling. Midland’s, though, is not such a claim. Even assuming that the district court properly determined that the company’s claim against Enron “related back” to its claim against ENA and that it therefore constituted an “amendment,” because the critical factors under both the equitable test applicable to amended claims and the
 
 Pioneer
 
 test weigh heavily against it, the claim must in any event fail.
 

 CONCLUSION
 

 For the foregoing reasons, we agree with the bankruptcy court that three of the four
 
 Pioneer
 
 factors favor Enron. We cannot conclude that the bankruptcy court abused its discretion in finding that Midland failed to meet its burden of proving “excusable neglect,” and in rejecting Midland’s late-filed claim on that basis. The judgment of the district court is affirmed.
 

 [1]
 

 . Judge Learned Hand said of statutes of limitations:
 

 They are often engines of injustice; their justification lies in furnishing an easy and certain method of solving problems which are often intrinsically insoluble, or soluble only with so much uncertainty and after so much trouble that in the long run the game is not worth the candle. Perhaps they are not justifiable at all .... But where they do exist one must be prepared for hard cases, and it is no answer that this is one.
 

 Helvering v. Schine Chain Theaters, Inc.,
 
 121 F.2d 948, 950 (2d Cir.1941).
 

 Silivanch,
 
 333 F.3d at 367 (footnote in original; renumbered).
 

 [2]
 

 . The bankruptcy court's opinion suggests that it considered this factor only in relation to the equitable test for amending claims,
 
 see infra
 
 part IV, and not necessarily with respect to the prejudice analysis under
 
 Pioneer.
 
 Accordingly, even if the court’s "floodgate” analysis
 
 was
 
 unduly speculative, it is not clear that such an error would be relevant to
 
 this
 
 appeal. Still, we consider the issue to the extent the "floodgate” concern might have implicitly affected the court's prejudice analysis, and because, as we have indicated, courts in this and other Circuits regularly cite the potential “flood” of similar claims as a basis for rejecting late-filed claims.